Filed 7/20/22  In re T.S. CA2/7

**NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION SEVEN

| | |
|---|---|
| In re T.S. et al., Persons Coming Under the Juvenile Court Law. | B311622 |
| LOS ANGELES COUNTY DEPARTMENT OF CHILDREN AND FAMILY SERVICES, | (Los Angeles County Super. Ct. No. DK24133AB) |
| Plaintiff and Respondent, | |
| v. | |
| VACHESLAV S., | |
| Defendant and Appellant. | |

APPEAL from an order of the Superior Court of Los Angeles County, Stacy Wiese, Judge.  Affirmed.

Nancy R. Brucker for Defendant and Appellant.

Rodrigo A. Castro-Silva, County Counsel, Dawyn R. Harrison, Acting County Counsel, Kim Nemoy, Assistant County

Counsel, Kimberly Roura, Senior Deputy County Counsel, and David M. Miller for Plaintiff and Respondent.

_____

Vacheslav S., father of now-12-year-old T.S. and eight-year-old Christian S., appeals the juvenile court's order granting sole physical custody of the children to their mother, Nataliya S., granting joint legal custody to both parents and restricting Vacheslav's unmonitored in-person visitation to within the United States. On appeal Vacheslav argues the court's custody and visitation order was not in the best interest of the children and constituted an abuse of discretion. We affirm.

## FACTUAL AND PROCEDURAL BACKGROUND

1. *The Sustained Dependency Petition, the First Termination of Jurisdiction and the First Appeal*

On August 1, 2017 the Los Angeles County Department of Children and Family Services filed a petition to declare T.S. and Christian dependent children of the juvenile court under Welfare and Institutions Code section 300, subdivision (b)(1),[1] after police found a handgun and eight ounces of cocaine in the family home.[2] The children were detained from Nataliya and placed with their

_____

[1] Statutory references are to this code unless otherwise stated.

[2] The events leading to the Department's filing of a dependency petition, Nataliya's and Vacheslav's conduct during the pendency of the case and the juvenile court's initial termination of jurisdiction in October 2018 are set forth in detail in our prior opinion reversing the termination of jurisdiction and remanding for a contested section 364 hearing. (*In re T.S.* (2020) 52 Cal.App.5th 503.)

maternal grandmother.  Family reunification services and monitored visitation were ordered for Nataliya.

During the course of its investigation the Department learned Nataliya and T.S. had emigrated to the United States from Russia in 2013, while Nataliya was pregnant with Christian.  Christian was born in the United States and had never lived in Russia.  The children had never resided with Vacheslav, who still lived in Russia; and, prior to the filing of the dependency petition, Vacheslav had met Christian only three times.  Vacheslav's telephone contact with the children had been sporadic, and he had no contact with them for about a year prior to the petition's filing.  During a September 2017 monitored visit with Vacheslav, the Department monitor observed the children did not display any signs of affection or attachment to Vacheslav and may not have even recognized him.

The petition was sustained on October 12, 2017.  The continued disposition hearing was held on February 22, 2018.  The Department reported Nataliya's visits with the children were going well, including unmonitored overnight visits, and the children had a strong bond and attachment to her.  However, the Department was concerned about her poor judgment in associating with men with extensive criminal histories—her husband Albert N., whose arrest precipitated the search of the family home resulting in the involvement of the Department, was a major figure in a drug cartel; and the Department had recently denied Nataliya's request that her friend, Vahe T., be approved as a monitor for her visits because Vahe had an extensive criminal record.  The Department also reported Vacheslav had two visits with the children in December 2017 but had not maintained regular contact.  The court declared T.S. and

Christian dependents of the court and released them to Nataliya. Vacheslav was permitted unmonitored visits virtually and in California.

The 12-month review hearing was held on October 9, 2018. The Department reported Nataliya had made significant progress in therapy and counseling. Vacheslav had unmonitored telephone visits with the children at least once per week and had several unmonitored weekend visits with them in Los Angeles during 2018. After denying Vacheslav's request for a contested hearing, the court found Nataliya had complied with her case plan and the children were no longer at risk. The court terminated jurisdiction over T.S. and Christian and granted sole physical and legal custody to Nataliya. Vacheslav was awarded unmonitored visits in California two weekends each month, plus video calls at least once per week.

Vacheslav appealed the juvenile court's custody and visitation order, contending the court had erred in denying his request for a contested hearing. We agreed and reversed the orders terminating jurisdiction, giving custody to Nataliya and granting visitation to Vacheslav. We remanded the matter to the juvenile court "for a contested section 364 hearing at which all parties may present evidence concerning their present circumstances and the children's best interest." (*In re T.S.* (2020) 52 Cal.App.5th 503, 518.) The remittitur issued October 14, 2020.

2. *The Department's Investigation on Remand*

On remand the Department prepared a status report in advance of the contested section 364 hearing. After observing the family in late October 2020, the social worker stated Nataliya was cooperative and engaged. T.S. and Christian were bonded to

4

their mother and looked to her for guidance. However, the children were behind on medical and dental appointments—T.S. had not had a physical in more than two years, and the boys had not been to the dentist since August 2019. Nataliya said she had not wanted to take the children to the doctor or dentist due to the COVID-19 pandemic.

In an interview conducted on October 30, 2020, Nataliya told the Department social worker she and the children were living in a house with two roommates and she was working as a florist, painter and life coach. Nataliya had filed for dissolution of her marriage from Albert, and the judgment of dissolution was issued in February 2020. Neither Nataliya nor the children had any contact with Albert. Nataliya stated Vacheslav's contact with the children had been inconsistent since the case had closed in 2018. At first Vacheslav called the boys regularly, but the calls became less frequent and eventually stopped. There had been no in-person visits with Vacheslav since 2018.

According to Vacheslav, Nataliya had prevented him from having contact with the children. She took away the cell phones he had given them, and she refused to allow him to see the children when he was in California in January 2019. When he did speak to the children, Nataliya would often interrupt or instruct the boys on what they could discuss with Vacheslav. Vacheslav also claimed Nataliya had filed documents in the Russian court that prevented him from leaving the country. Ultimately, Vacheslav ceased having contact with the children after Nataliya sent him a video of the boys in which they addressed Vacheslav, stating, "I'm going to fuck you up," "I'm going to drag you all the way to hell," "Give us please our toys or else I'll . . . I'll fuck you up." The boys were laughing during the

video, which ended with T.S. saying, "Mom, now please stop the video."

Nataliya denied preventing Vacheslav from talking to or visiting the children. In regard to Vacheslav's attempted visit in January 2019, Nataliya claimed he had only given her one day's notice that he would be in town and she had already taken the boys on vacation. When asked about the video in which T.S. and Christian were cursing at Vacheslav, Nataliya said she allowed them to record it as a form of therapeutic release. She knew the boys were angry with Vacheslav because he had not sent them toys he had promised, but she did not realize how upset they were until they recorded the video. She also recognized it had not been a good idea to send the video to Vacheslav, but she felt the children's feelings needed to be communicated. As for the Russian court's prohibition on Vacheslav leaving the country, Nataliya indicated the order had to do with child support arrears, but Vacheslav had paid the amounts due, and, as far as Nataliya knew, he was able to travel internationally. Nataliya insisted she would comply with any court orders and would make the children available for visits. However, she was concerned that, if the children visited Vacheslav in Russia, he would prevent them from returning.

When interviewed by the social worker, T.S. did not appear interested in resuming virtual visits with Vacheslav. He deflected the social worker's attempts to discuss the topic. Christian stated he did not want to resume visits with Vacheslav and appeared anxious when asked about it.

Vacheslav also reported he was concerned the boys were behind academically. He had asked them to write essays in exchange for toys, and Vacheslav then took the essays to teachers

in Russia to be evaluated.  According to Vacheslav, those teachers concluded the boys were performing far below grade level.  However, according to his 2019-2020 report card, T.S. received special education services and was performing at grade level in his alternative curriculum program.  Christian's 2019-2020 report card stated he struggled in certain areas but was meeting or approaching grade level standards in other areas.  He was currently being evaluated for special education services for speech therapy.

Vacheslav believed T.S. and Christian were not safe in Nataliya's care because she continued to have contact with Albert and Vahe.  Vacheslav wanted the children to be placed in his custody in Russia.  He presented the Department with a translation of a Russian court judgment dated May 30, 2018 that granted him physical custody of the children.[3]  Vacheslav committed to ensuring the children maintained contact with Nataliya if they were placed in his custody.

The Department concluded there were no safety concerns to justify continued dependency jurisdiction.  Nataliya had adequately provided for the children's health, education and

[3]     As part of the Russian court proceeding the family was interviewed by Russian social workers or psychologists.  Based on those interviews the Russian court found "the level of emotional attachment" between Nataliya and the children was high; however, the children did not perceive Nataliya as an authority figure.  One evaluator strongly recommended T.S. be placed in a "crises hospital" due to the stress within the family.  Based in part on these findings and recommendations, as well as the allegations in the dependency petition and the Department's reports in this proceeding, the Russian court found the children should live with Vacheslav.

mental health needs for the two years since the case had closed. She had addressed the issues that initially warranted Department intervention and had been able to keep the children safe. The Department recognized Vacheslav's concerns regarding "the children's poor educational outcomes, mother's history of poor choices and the quality of the home environment," and agreed the concerns were valid. However, in the Department's opinion, those concerns did not indicate a current safety risk to T.S. and Christian. Further, the Department stated it would not be in the children's best interest "to be uprooted from a country they have known and lived in since birth and a very young age, to reside in the care of their father in a country and cultural environment they are not familiar with."

The Department recommended the court terminate jurisdiction over the minors, grant sole physical custody to Nataliya and joint legal custody to both parents, and order unmonitored overnight visits with Vacheslav in California. In subsequent reports filed in November 2020 and January 2021 the Department altered its recommendation to joint legal and physical custody with the primary residence with Nataliya. It is not apparent from the record on appeal what led to this change.

3. *The Resumption of Visitation with Vacheslav*

During a trial setting conference on December 4, 2020 the juvenile court ordered Vacheslav could have three virtual visits per week with the children. As of January 15, 2021 T.S. told a Department social worker he had virtual visits with Vacheslav three mornings per week. They talked about what was happening in T.S.'s life, and T.S. liked to show Vacheslav videos that T.S. had made. T.S. did not want to visit Vacheslav in Russia because he was concerned Vacheslav would not let him

8

return to the United States. Christian said he did not want to talk to Vacheslav and refused to participate in the visits. He typically slept through the calls and said he would continue to do so. He did not want to have in-person visits with Vacheslav. When the social worker continued to ask Christian about his father, Christian pretended to be asleep and then left the room.

In a last minute information report filed February 16, 2021 the Department stated the children's visits with their father were continuing three times per week. Vacheslav felt the visits were going well, although he suspected Nataliya might be coaching the boys on what to say. T.S. reported the visits were going "great" and he enjoyed talking to his father. Christian continued to sleep through most of the visits, but T.S. had woken him for one visit recently. When asked about the visits, Christian refused to answer and left the room.

4. *The Contested Section 364 Hearing*

The contested section 364 hearing was held over four days in February and March 2021. Nataliya, Vacheslav, a Department social worker and a private investigator hired by Vacheslav testified. Nataliya testified she wanted the children to have a relationship with their father and she had not made negative comments about him or done anything to prevent visits. She said she had encouraged Christian to wake up for virtual visits, but she recognized she could be more proactive about it. Nataliya recognized the children's behavior in the video they recorded was inappropriate, and she reprimanded them afterward. She denied sending the video to Vacheslav, stating it was recorded on T.S.'s phone and T.S. had sent it. Nataliya reiterated she would follow any court orders regarding custody and visitation. However, given the Russian court's order

granting custody to Vacheslav, she would resist sending them to Russia for visits because she believed Vacheslav would never let them return. She also explained her and T.S.'s green cards had expired and they were currently in removal proceedings. Accordingly, if T.S. were to leave the United States, he might not be able to return.[4]

Nataliya continued to deny any recent contact with Albert. Upon further questioning she admitted Albert had moved back into the family home when he was released on bond in late 2018. Nataliya explained she had only a few days' notice Albert would be released. She was able to arrange to stay at a friend's apartment with the boys. However, because she ran her business out of the house and the boys' school was nearby, she did have to return to the house occasionally while Albert was there. Initially, Nataliya denied she and the children ever spent the night in the house with Albert. She subsequently admitted she and the boys did occasionally stay in the house with Albert. She denied ever

---

[4]     Vacheslav has requested, pursuant to our statutory authority to take additional evidence on appeal (Code Civ. Proc., § 909; see Cal. Rules of Court, rule 8.252(c)), that we include in the record declarations of Vacheslav and his attorney dated June 17, 2022. The declarations contain information regarding Nataliya and T.S.'s immigration status and state Nataliya and the children are currently living in Russia. Because these matters are more appropriately addressed in the family law court on a motion to modify a custody order, we deny the request. (See generally *In re Zeth S.* (2003) 31 Cal.4th 396, 405 ["[i]t has long been the general rule and understanding that 'an appeal reviews the correctness of a judgment as of the time of its rendition, upon a record of matters which were before the trial court for its consideration'"].)

leaving the children alone with him. Albert ultimately moved out of the house in July 2019.

Vacheslav testified he wanted T.S. and Christian to live with him in Russia. He said he would continue to facilitate their relationship with Nataliya. When asked whether, if he were permitted to have visits with the children in Russia, he would allow the children to return to the United States afterward, Vacheslav stated he would "follow all court orders and follow all the laws." When asked whether he would comply with an order in this proceeding if it conflicted with the order in Russia awarding him sole custody, Vacheslav again stated, "I will follow all court orders."

The surveillance reports of Derek Nelson, a private investigator hired by Vacheslav at various times between 2018 and 2021, were admitted into evidence. The reports stated Nelson watched the family home for five days in February and March 2019 and seven days in June 2019. During those times he observed Albert in the home three times; on at least one occasion T.S. and Cristian were also there. Nelson testified that, based on his observations, he believed the children were living at the house while Albert was also there. Nelson resumed surveillance of the family home for a few weeks in February 2021. He did not see Albert during that time, but he did see Vahe at the home two days in a row in February 2021. Finally, Nelson stated Nataliya tended to drive erratically and at speeds over the limit.

Proceeding to argument, all parties agreed the court should terminate jurisdiction but had differing positions regarding custody. Nataliya's counsel requested the court grant joint legal custody and sole physical custody to Nataliya. She also requested Vacheslav's visits take place within the United States

or, if the visits occurred in Russia, that there be a specific order for the children to be returned to the United States at the conclusion of the visits. The Department requested joint legal and joint physical custody with the primary residence with Nataliya. The Department did not object to the children traveling to Russia to visit Vacheslav so long as both children would be able to legally return to the United States. T.S. and Christian's attorney requested joint legal and sole physical custody to Nataliya with Vacheslav entitled to unmonitored visits in the United States. Vacheslav's attorney requested joint legal custody and sole physical custody to Vacheslav in Russia. She argued Nataliya had continued to create an unsafe home environment for the children by exposing them to Albert and Vahe, had disparaged Vacheslav and tried to thwart his relationship with the boys, and had jeopardized the children's safety by driving erratically. On the other hand, according to Vacheslav's counsel, Vachislav could provide a safe home to the children in Russia and, as the Russian court had concluded, was the "far better parent to raise these children."

5. *The Termination of Jurisdiction and the Custody Order*

The juvenile court terminated jurisdiction and found it was in the children's best interest for Nataliya to have sole physical custody, for the parents to have joint legal custody and for Vachislav to have unmonitored visits in the United States. The court explained its reasoning in detail on the record, stating the children appeared to be doing well and Nataliya had completed her court-ordered programs. The court acknowledged there was evidence Albert had been in the home in 2019; however, it found there was no evidence the children had been left alone with him. As for the presence of Vahe in the home recently, the court stated

12

the fact Vahe had not been approved as a monitor in 2018 did not preclude Nataliya from being friends with him or allowing him in her home. The court declined to grant visitation in Russia given the Russian court order giving Vacheslav custody and his equivocal answer as to whether he would return the children to the United States.

The court held a hearing on March 22, 2021 to finalize the custody and visitation order. The court again explained the reasons for its custody finding, stating, "The father was not involved in these boys' lives until the Department got involved. Even after that, I feel as though he has not been involved in their life. I am not going to uproot these children and move them to another country with an individual they are not that close with. They just haven't had enough time with him, and I have to find what's in the best interest of the children. . . . I think both mother and father's credibility has been at issue since day one. I don't know that either of them has been truthful, completely truthful with us. . . . [The children] appear to be doing fine with their mother."

The juvenile custody order was entered March 23, 2021, granting joint legal custody to the parents and sole physical custody to Nataliya and ordering unmonitored visits for Vacheslav in the United States and virtual visits for a minimum of three hours per week.

## DISCUSSION

### 1. *Governing Law and Standard of Review*

When the juvenile court terminates dependency jurisdiction, the court "may issue . . . an order determining the custody of, or visitation with, the child." (§ 362.4, subd. (a).) Section 362.4 specifies that order "shall continue until modified

13

or terminated by a subsequent order of the superior court" and directs the order be filed in a pending family law proceeding (§ 362.4, subd. (b)) or, if there is none, as part of a new family court file (§ 362.4, subd. (c)). (See *In re R.F.* (2021) 71 Cal.App.5th 459, 473 ["[s]ection 362.4 authorizes a juvenile court to issue exit orders for visitation and custody when terminating dependency jurisdiction, and those orders remain in place even after jurisdiction is terminated"]; see also *In re Destiny D.* (2017) 15 Cal.App.5th 197, 208 [referring to "the court's statutory discretion to impose necessary limitations on an offending parent's contact with a dependent child before terminating its jurisdiction"].)

When making a juvenile court custody order pursuant to section 362.4, "it is the best interests of the child, in the context of the peculiar facts of the case before the court, which are paramount." (*In re John W.* (1996) 41 Cal.App.4th 961, 965; accord, *In re T.S.*, *supra*, 52 Cal.App.5th at p. 513; *In re Nicholas H.* (2003) 112 Cal.App.4th 251, 268.) "Unlike in family court, '"[t]he presumption of parental fitness that underlies custody law in the family court . . . does not apply to dependency cases" decided in the juvenile court. [Citation.]' [Citation.] When the juvenile court makes custody or visitation orders as it terminates dependency jurisdiction, it does so as a court with 'a special responsibility to the child as *parens patriate* and [it] must look to the totality of a child's circumstances when making decisions regarding the child.'" (*In re J.T.* (2014) 228 Cal.App.4th 953, 963.)

We review a juvenile court custody or visitation order for abuse of discretion. (*In re C.W.* (2019) 33 Cal.App.5th 835, 863; *In re M.R.* (2017) 7 Cal.App.5th 886, 902; see *In re T.H.* (2010)

14

190 Cal.App.4th 1119, 1124.) We "may not disturb the order unless the court ""exceeded the limits of legal discretion by making an arbitrary, capricious, or patently absurd determination.""" (*Bridget A. v. Superior Court* (2007) 148 Cal.App.4th 285, 300-301; accord, *In re M.R.*, at p. 902.)

2. *The Juvenile Court Did Not Abuse Its Discretion in Issuing Its Custody and Visitation Order*

Vacheslav contends the juvenile court abused its discretion in awarding sole physical custody to Nataliya because she created a dangerous home environment by associating with Albert and Vahe, driving erratically while the children were in the car, failed to take the children to routine medical and dental appointments, and failed to renew T.S.'s green card. In addition, Nataliya interfered with the children's relationship with Vacheslav. On the other hand, Vacheslav argues, it would be in the children's best interest to live with him, as the Russian court determined, because he has no criminal record, has developed a strong relationship with T.S. and Christian, was willing to comply with court orders to bring the children to the United States for visits with Nataliya and would support Nataliya's relationship with the children.

Vacheslav's arguments essentially invite us to reweigh the evidence and credibility determinations made by the juvenile court, tasks outside the province of a reviewing court. (See, e.g., *In re I.J.* (2013) 56 Cal.4th 766, 773 [""issues of fact and credibility are the province of the trial court""]; *In re Eli B.* (2022) 73 Cal.App.5th 1061, 1072 ["[i]n reviewing the juvenile court's ruling we cannot reweigh the evidence or evaluate witness credibility"; "[w]e must uphold the juvenile court's factual determination as long as it is supported by substantial evidence

15

"'even though substantial evidence to the contrary also exists and the trial court might have reached a different result had it believed other evidence'"]; *In re S.R.* (2020) 48 Cal.App.5th 204, 219 ["'[w]e do not reweigh the evidence'"].)

There was ample evidence supporting the court's finding Nataliya did not pose any threat to T.S.'s and Christian's safety. As the court explained, Nataliya had completed the court-ordered programs, neither the Department nor the service providers had concerns about Nataliya's ability to safely care for the children, and the children were doing well and were strongly bonded with their mother. Nataliya was the only parent with whom the children had ever lived. T.S. had left Russia when he was three years old, and Christian had never lived there. While the court acknowledged Albert had lived in the family home in 2019 and potentially had contact with the children, the family had not seen Albert in almost two years by the time of the section 364 hearing. Likewise, Nataliya's recent contact with Vahe did not pose a substantial risk to the children. The Department's determination Vahe was not an appropriate monitor during the seven months the children had been detained from Nataliya and during which her ability to provide a safe home was under review did not mean his friendship with Nataliya itself posed a substantial risk to the children, particularly when Nataliya had been providing a safe home for more than two years. The circumstances Vacheslav emphasizes, even if they demonstrated poor choices on Nataliya's part, do not rise to the level of a substantial safety risk, nor do they undermine the benefit to the children in remaining in Nataliya's care.

While Vacheslav may have also been able to provide a safe home for the children, that alone does not entitle him to custody.

16

(See *In re Nicholas H., supra,* 112 Cal.App.4th at p. 268 ["a finding that neither parent poses any danger to the child does not mean that both are equally entitled to half custody, since joint physical custody may not be in the child's best interests for a variety of reasons"]; *In re John W., supra,* 41 Cal.App.4th at p. 974 [same].) It was well within the court's discretion to conclude it was not in the children's best interest to uproot them from the country they had lived in for all, or most of, their lives to live with a parent with whom they had never resided, had demonstrated animosity and/or ambivalence toward, and with whom they had not had consistent contact. It may also have been within the court's discretion to order sole custody to Vacheslav, but it was not arbitrary or irrational for the court to conclude it was in the best interest of the children to award sole physical custody to Nataliya.

The same is true for Vacheslav's argument the court abused its discretion by ordering visitation must occur within the United States. There was substantial evidence in the record to support the inference the children would not be able to return to the United States if they travelled to Russia for visits. Vacheslav had a Russian court order awarding him custody that he could have used to prevent the children from leaving Russia, and he declined to commit to allowing them to return to the United States if there were conflicting Russian and California court orders. On this record, we cannot say the court acted arbitrarily in ordering that visitation occur in the United States.

## DISPOSITION

The juvenile court's custody and visitation order is affirmed.

PERLUSS, P.J.

We concur:

SEGAL, J.

FEUER, J.